UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLARENCE GROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 9465 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| TOWN OF CICERO; BETTY LOREN-MALTESE, | ) | |
| former President of the Town of Cicero; | ) | |
| RAMIRO GONZALEZ, President of the Town | ) | |
| of Cicero; and EDWARD VRDOLYAK, individually. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Clarence Gross ("Gross"), filed suit against Defendants, the Town of Cicero,

Betty Loren-Maltese, Ramiro Gonzalez, and Edward Vrdolyak. Count I of Plaintiff's First Amended

Complaint alleges a violation of the Plaintiff's First Amendment rights, and Count II alleges a

violation of Plaintiff's Equal Protection rights. Cicero filed a Counterclaim against Plaintiff, alleging

unjust enrichment and breach of fiduciary duty. Presently pending before the Court are:

(1) Plaintiff's Motion for Summary Judgment on Cicero's Counterclaim, (2) Cicero's Motion for

Partial Summary Judgment on the Counterclaim, (3) Cicero and Gonzalez's Joint Motion for

Summary Judgment, (4) Loren-Maltese's Motion for Summary Judgment, and (5) Vrdolyak's

Motion for Summary Judgment.

1

## BACKGROUND[1]

Gross retired as a police officer from the Cicero Police Department in 1997. (Def.'s 56.1(a)(3) Statement ¶ D2). Following his retirement, Gross was appointed by Loren-Maltese (then Cicero's Town President) as Deputy Liquor Commissioner, as Director of Internal Services, and to the 9-1-1 Board (Id., ¶¶ D7-D9, D18). In 1998, Loren-Maltese appointed Gross to the position of Hearing Officer and as Chairman of the Town of Cicero Board of Fire and Police Commissioners ("BOFPC"). (Id., ¶ D3; Pl.'s 56.1(b)(3) Statement ¶ E18). The Town Board, as required, concurred with Gross's appointment. (Def.'s 56.1(a)(3) Statement ¶¶ D4-D5).

The appointment of Gross as Chairman of the BOFPC was for a three-year term of January 1998 through December 2000. (Def.'s 56.1(a)(3) Statement ¶ D6). Gross did not receive any additional compensation after he was appointed to the BOFPC. (Id., ¶ D12). Gross believes that his subsequent appointment to the BOFPC was also for a three-year term. (Pl.'s 56.1(b)(3) Statement ¶ E30; Def.'s Response ¶ E30). By letter dated April 12, 2000, the Cicero Town Clerk advised Gross that he had been reappointed as Chairman of the BOFPC, effective immediately. The letter did not specify a set term. (Defs. 56.1(a)(3) Statement ¶ C 15; Defs. ex. H). Gross was not informed that there was a specified term-limit to the position of Hearing Officer and that they are not reappointed every year. (Pl.'s 56.1(b)(3) Statement ¶ E20).

---

[1]The following undisputed facts are derived from the parties' proposed statements of facts and proposed additional statements of facts. Many of the proposed undisputed facts are included in multiple parties' statements of facts; however, only one citation is included in the Memorandum Opinion and Order. The statements of undisputed facts are designated as follows: Plaintiff's Motion for Summary Judgment on Cicero's Counterclaim – "A"; (2) Cicero's Motion for Partial Summary Judgment on the Counterclaim – "B"; (3) Cicero and Gonzalez's Joint Motion for Summary Judgment – "C"; (4) Loren-Maltese's Motion for Summary Judgment – "D"; and (5) Vrdolyak's Motion for Summary Judgment – "E".

As the Chairman of the BOFPC, Gross oversaw disciplinary matters that were brought before the BOFPC by the Superintendent of the Police or the Town President. Gross also oversaw the application process for applications for the position of probationary police officers and firefighters. He also acted as an adjudicator on matters heard before the BOFPC. (Pl.'s 56.1(b)(3) Statement ¶ C25). Gross was involved in the testing process for the application to the position of police officer for Cicero. (Pl.'s 56.1(a)(3) Statement ¶ A9). After the applicants successfully passed an examination and background check, Gross would recommend the applicants for the position of probationary police officer. (Id., ¶ A10).

Gross claims that Loren-Maltese guaranteed him employment for eight years, commencing in 1997, even though he knew that the term for Town President was only for four years. (Def.'s 56.1(a)(3) Statement ¶¶ D10-D11). She also told Gross that he would be compensated one salary for all the positions he held with Cicero. (Pl.'s 56.1(b)(3) Statement ¶E3). Gross's salary history from Cicero was: January 3, 1998 through December 19, 1998 – $62,425.12; January 5, 1999 through December 23, 1999 – $61,621.88; January 7, 2000 through December 22, 2000 – $62,771.72; January 5, 2001 through December 21, 2001 – $66,431.24; and January 4, 2002 through October 25, 2002 – $50,223.83. (Pl.' 56.1(b)(3) Statement ¶ E4).

In 1999, Rhonda Gross, Gross's daughter, was hired as a Cicero Police Officer. (Def.'s 56.1(a)(3) Statement ¶ D13). In June 2001, Rhonda filed a charge of discrimination with the Equal Employment Opportunity Commissioner, claiming that another police officer, Jerald Rodish, had sexually harassed her. (Id., ¶ D15). Later, Rhonda filed a second charge of discrimination, alleging retaliation. (Id., ¶ D17).

3

Rhonda's claims included that she had lost additional hours in 2000 working at a local school because she refused to succumb to the alleged sexual harassment. (Def.'s 56.1(a)(3) Statement ¶ D49). Gross did not speak to Loren-Maltese or any school district official about Rhonda's lost hours due to the alleged harassment. (Id., ¶¶ D50-D51). Loren-Maltese was not involved with the school district and was not on the school board. (Id., ¶¶ D53-D55).

After Rhonda had filed her EEOC charge, Loren-Maltese told Gross that she could no longer trust Gross or his daughter because of "this EEOC thing" and that Rhonda was lucky to have a job. (Pl.'s 56.1(b)(3) Statement ¶ E1).

Gross attempted to speak with Loren-Maltese on at least six occasions in 2001 regarding the alleged harassment of his daughter. (Def.'s 56.1(a)(3) Statement ¶ D37). However, Gross never actually spoke with Loren-Maltese about how Rhonda was being treated or that she was being sexually harassed because, when he approached Loren-Maltese, she would state that she knew what he was there for, what it was about, and that she would talk to him later. (Id., ¶¶ D38-D45; Pl.'s Response ¶¶ D38-D45). In his final attempt to speak with Loren-Maltese about his daughter's alleged negative treatment, Loren-Maltese told Gross to "just call Eddie about it." (Id., ¶ D46). Gross did not contact Edward Vrdolyak. (Id., ¶¶ D47-D48). Because Gross did not feel that he nor his daughter were getting any resolution to the problem, Gross encouraged Rhonda to file the EEOC charge. (Pl.'s 56.1(b)(3) Statement ¶ E90). On October 24, 2002, a conciliation agreement was signed regarding Rhonda's alleged harassment. (Id., ¶ E65; Def.'s Response ¶ E65). Gonzalez knew of the negotiations among the EEOC, Rhonda, and Cicero. (Pl.'s 56.1(b)(3) Statement ¶ E96).

Edward Vrdolyak is an attorney licensed to practice law in the State of Illinois. (Def.'s 56.1(a)(3) Statement ¶ D24). Vrdolyak's law firm has been hired from time to time to act as outside

4

counsel, representing Cicero and various town officials and/or employees in various litigation matters. (Id., ¶ D25). Neither Vrdolyak nor his firm has ever served or been appointed as Town Attorney. (Id., ¶¶ D26-D27). Rodish listed Vrdolyak as a reference when he applied for the Cicero Police Department, and Vrdolyak's law firm has represented Rodish. (Pl.'s 56.1(b)(3) ¶ C120).

Vrdolyak and Loren-Maltese never discussed Gross or his daughter, including Rhonda's EEOC charge. (Def.'s 56.1(a)(3) Statement ¶¶ D34, D36). Vrdolyak, Loren-Maltese, and Gonzalez never had any meetings about Gross or his daughter. (Id., ¶ D35). Loren-Maltese never spoke with Gonzalez regarding Rhonda. (Id., ¶ D60). Vrdolyak, Loren-Maltese, and Gonzalez are "friends." (Pl.'s 56.1(b)(3) Statement ¶ C124).

Gross alleges that he was terminated from the 9-1-1 Board in October 2001. (Def.'s 56.1(a)(3) Statement ¶ D68). Gross does not recall when he last attended a 9-1-1 Board meeting. (Id., ¶ D69). Loren-Maltese asserts that she did not terminate Gross from the position on the 9-1-1 Board, from the position of the Director of Internal Services, or from the position of the Deputy Liquor Commissioner. (Id., ¶¶ D73-D77). Gross worked in his capacity as the Director of Internal Services and as Deputy Liquor Commissioner through September 23, 2002. (Id., ¶¶ D66-D67; Pl.'s 56.1(b)(3) Statement ¶ E13).

In August 2002, Loren-Maltese resigned as Cicero's Town President. (Def.'s 56.1(a)(3) Statement ¶ D20). On September 10, 2002, Gonzalez took office as Cicero's Town President. (Id., ¶ D22). Gonzalez served as Town President until May 9, 2005. (Id., ¶ D23).

On September 23, 2002, Gross received a letter signed by Gonzalez, stating that he was being terminated from his position as Deputy Liquor Commissioner. (Pl.'s 56.1(b)(3) Statement ¶ E66). After receiving the letter, Gross called Vrdolyak and informed him of the letter. Vrdolyak stated,

5

"I can't understand why she did this to you" or "had done this to you." Vrdolyak denies making the statement.  (Id., ¶ E67; Def.'s Response ¶ E67). At this same time, Dennis Both, an attorney at Vrdolyak's law firm, was working on Rhonda's EEOC charge and conciliation agreement. (Pl.'s 56.1(b)(3) Statement ¶ E68). Gonzalez asserts that he terminated Gross because he did not know him and because he had heard rumors. (Id., ¶ E69).

Defendants assert that Gross was not terminated from his position as Chairman of the BOFPC but that he was not reappointed to the BOFPC. Gross asserts that he was terminated as Chairman of the BOFPC in January 2002 by Loren-Maltese. (Def.'s 56.1(a)(3) Statement ¶¶ D71-D72, Pl.'s Response ¶¶ D71-D72).

Loren-Maltese never spoke to Vrdolyak or Gonzalez about Gross's termination as Deputy Liquor Commissioner. (Id., ¶¶ D58-D59). Loren-Maltese never directed Gonzalez to terminate any position Gross held with Cicero. (Id., ¶ D61). Loren-Maltese asserts that she did not reappoint Gross to the BOFPC because of improper conduct by Rhonda and Gross's favoritism toward Rhonda in the face of that conduct and doubts that she developed about Gross's judgment. (Defs. 56.1(a)(3) Statement ¶ C32). Loren-Maltese questioned: (1) Gross's judgment and the hiring standards he was applying in hiring new police officers, (2) her perceived favoritism toward his daughter and other officers, (3) his temper based on rumors that in April 1997 he had beaten a man in custody who had expressed an interest in Rhonda, and (4) his honesty and degree of cooperation with a pending State Police investigation. (Id., ¶ D83; Pl.'s 56.1(b)(3) Statement ¶ E59). Loren-Maltese testified that "a lot" of the reason she terminated Gross was "based around his daughter." (Pl.'s 56.1(b)(3) Statement ¶ C41).

Cicero alleges that several police officers that were "unqualified" were appointed by the BOFPC while Gross was the Chairman. (Pl.'s 56.1(a)(3) Statement ¶ A12). Anthony Iniquez, Superintendent of the Cicero Police Department, testified that these police officers were qualified, "if he's performing his job as an officer." (Id., ¶¶ A13-14; Def.'s Response ¶ A14).

There were discreet steps in the application and testing process for candidates for Cicero. Candidates were separated into two categories, new hires and lateral hires. Both were required to file a written application with the Board. The applications were reviewed for any disqualifying factors. If the applicant was not disqualified on the face of the application, then the candidate was directed to attend an orientation and submit a written test. (Def.'s 56.a(a)(3) Statement ¶ B9). If candidates attended the orientation and passed the written test, they were directed to complete a physical agility test. Lateral hires were not required to take written or physical agility tests. (Id., ¶ B11). Once a candidate completed the written application, attended the orientation, passed the written and physical agility tests, the applicant then submitted to an oral interview with the members of the BOFPC. (Id., ¶ B11).

After these initial application stages, an eligibility list was created by the BOFPC, ranking the remaining applicants who had successfully completed the application process up to that point. Within ten days of the publication of the initial eligibility list, a final list would be created that would adjust the candidate's position based upon any candidate who asserted points for military service. (Def.'s 56.1(a)(3) Statement ¶ B12). Two lists were created, one for new hires and one for lateral applicants. (Id., ¶ B13). The eligibility lists expired two years after their initial publication. (Id., ¶ B14). As police officers were needed, candidates were selected in the order of their appearance

on the eligibility lists. (Id., ¶ B15). However, before an eligible candidate was hired, he was required to submit to psychological and polygraph examinations. (Id., ¶ B16).

In order to become police officers, individuals were required to pass an examination and background check and to be duly certified by the State pursuant to Illinois statute. If an officer does not receive state certification, the police department is supposed to terminate the officer's employment. (Pl.'s 56.1(a)(3) Statement ¶¶ A17-A18). Each of the police officers identified by Cicero as being "unqualified" passed their probationary period with the Police Department. Once they passed their probationary period and became sworn police officers, they could only be terminated for cause. (Id., ¶ A21). Cicero did not submit any administrative complaint to object or to challenge Gross's and the BOFPC's decisions to hire any of the alleged "unqualified" police officers. (Id., ¶ A23).

Gross testified that he knowingly hired applicants at the direction of Loren-Maltese and did not inform the other members of the BOFPC that such individuals were being hired at Loren-Maltese's direction. (Pl.'s 56.1(a)(3) Statement ¶ A5). Gross appointed some of these individuals even though he did not believe that they were "qualified." However, Gross would have to review the individual's complete file to definitively state that he or she was not "qualified." (Def.'s 56.1(a)(3) Statement ¶ B20; Pl.'s Response ¶ B20). For example, Gross appointed Loren Stenson despite the fact that he had scored low on his psychological evaluation. (Def.'s 56.1(a)(3) Statement ¶ B21). Gross hired the "unqualified" individuals that Loren-Maltese directed him to hire because he believed that, if he did not hire them, his positions would be terminated. (Id., ¶ B36). Each of the individuals cited by Cicero as being "unqualified" were appointed to the position of probationary police officer via the testing process by the BOFPC. Each candidate successfully completed the

Basic Training Course, as provided by Illinois law, and received final certification that he or she was qualified as a Law Enforcement Officer in the State of Illinois. Each candidate successfully completed his or her probationary period to become a police officer for Cicero. (Pl.'s 56.1(b)(3) Statement ¶ B3). The files for these police officers were available to other Board members for their review. (Id., ¶ B4). In 1999, the cost of retesting the thirty-three alleged unqualified police officers would be approximately $9,900 - $10,890. (Def.'s 56.1(b)(3) Statement ¶ A6).

Gross was named as a witness in the case *Moreno v. Town of Cicero*. (Pl.'s 56.1(b)(3) Statement ¶ E97). On August 13, 2003, Gross received a subpoena for his deposition in the *Moreno* case. The deposition never proceeded as scheduled. (Id., ¶¶ E100-E101). At one point, Gross spoke with Vrdolyak about past wages that Gross believed were due and owing to him from Cicero. (Pl.'s 56.1(b)(3) Statement ¶¶ E113-E115). During a September 12, 2003 conversation, Vrdolyak stated, "Your money matter won't be settled until the Moreno matter is settled. Do you understand me?" (Def.'s 56.1(a)(3) Statement ¶ E59, Pl.'s Response ¶ E59). Vrdolyak did not directly tell Gross not to tell the truth in the *Moreno* case. (Id., ¶ E60). Gross did not speak with Loren-Maltese about the *Moreno* case. (Id., ¶ E61). Gross did not give a deposition nor did he testify in the *Moreno* matter. (Id., ¶¶ E62-E63). Gross never received the compensation he requested, and his letters regarding the same have gone unanswered. (Pl.'s 56.1(b)(3) Statement ¶ E118). Gross spoke with one of Moreno's attorneys on December 4, 2003. (Id., ¶107).

### ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

9

All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmovant must still come forward with evidence establishing the elements of its claim on which it bears the burden of proof at trial. As such, it must establish specific facts that show there is a genuine issue for trial. *Miller*, 203 F.3d at 1003.

### Cicero's and Plaintiff's Motions for Summary Judgment on Cicero's Counterclaim

Cicero moves for partial summary judgment on its counterclaim for breach of fiduciary duty. Gross moves for summary judgment on Cicero's counterclaims of breach of fiduciary duty and unjust enrichment.[2]

#### *Breach of Fiduciary Duty Count - Lack of Subject Matter Jurisdiction*

Gross argues that the Court does not have subject matter jurisdiction over Cicero's breach of fiduciary duty claim under the Illinois Administrative Review Law because "all final decisions rendered by boards of fire and police commissioners constituted under the Act, including those regarding hiring, are reviewable exclusively under the Administrative Review Law." *Burgess v. Board of Fire & Police Commissioners of the Village of Evergreen Park*, 275 Il. App. 3d 315, 320 (1995) (*Burgess*). And, because the Board's hiring decision is reviewable only under the Administrative Review Law, this Court lacks subject matter jurisdiction over independent actions regarding hiring decisions. See *Burgess*, 275 Ill. App. 3d at 320. Gross's argument is based on the premise that the Administrative Review Law applies to all proceedings for the judicial review of

---

[2]Gross also moves to dismiss Cicero's counterclaims as a sanction for the Cicero attorney's instruction to certain individuals during their deposition not to answer certain questions based on the attorney-client privilege. Gross did not seek to compel the deponents to answer any deposition questions or seek any sanctions until this motion. Accordingly, sanctions, including dismissal, are denied.

final administrative decisions of the BOFPC relating to the removal or discharge, investigation of charges, and retirement of officers or members of the fire or police department.

*See* 65 ILCS 5/10-2.1-17.

Gross argues that Cicero did not file an administrative complaint under the Administrative Review Law, disputing the decision of Gross and the Board to hire the allegedly unqualified officers; therefore, the Court lacks jurisdiction over Cicero's breach of fiduciary duty claim. However, Cicero's breach of fiduciary claim does not challenge the administrative decision of Gross or the BOFPC to hire an applicant or discharge or remove any particular police officer, which would be governed by the Administrative Review Law. Instead, Cicero's breach of fiduciary duty claim challenges Gross's actions while sitting as Chairman of the BOFPC and his alleged failure to properly carry out his duties as Chairman. Accordingly, 65 ILCS 5/10-2.1-17 does not divest the Court of subject matter jurisdiction over Cicero's breach of fiduciary duty claim.

### Breach of Fiduciary Duty Count - Immunity from Liability

Gross argues that he is entitled to immunity for his discretionary decisions.

Gross did not plead any affirmative defenses, including immunity from suit, in response to Cicero's Counterclaim, as required by Federal Rule of Civil Procedure 8(c). Accordingly, Gross's failure to raise this defense until the time of summary judgment constitutes a waiver of that affirmative defense. *See MCI Telecomm. Corp. v. Amen-Tel*, 852 F. Supp. 659, 666 (N.D. Ill. 1994).

Even if Gross had not waived his immunity affirmative defense, it is meritless. Absolute judicial immunity shields quasi-judicial actors from liability for civil damages arising out of the performance of their judicial functions. *See Killinger v. Johnson*, 389 F.3d 765, 770 (7th Cir. 2004). In determining whether an official enjoys judicial immunity, the court examines "the nature of the

responsibilities of the official in question." *Tobin for Governor v. Illinois State Bd.*, 268 F.3d 517, 521 (7th Cir. 2001). Judicial immunity is defined and justified "by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988).

Here, Gross was not performing a judicial or quasi-judicial function when he recommended and hired certain individuals as police officers while a member of the BOFPC. The process of hiring the police officers is not of a judicial nature or function. *Cf. Reed v. Village of Shorewood*, 704 F.2d 943, 951 (7th Cir. 1983) (liquor commissioner entitled to absolute judicial immunity based on required procedures, including: (1) a finding that licensee violated the law after notice and hearing, (2) all evidence be reduced to writing and maintained in an official record, and (3) revocation was appealable to the state Liquor Control Commission).

Gross also argues that he is also immune under the Illinois Tort Immunity Act. Cicero responds that such immunity is not available to a breach of fiduciary claim that is based in equity, *see Kinzer on Behalf of the City of Chicago v. City of Chicago*, 128 Ill. 2d 437 (1989); Gross argues in his reply brief that he is entitled to the doctrine of Illinois common law public official immunity. Notwithstanding that Gross cannot present new arguments in his reply, *see United States v. Stevens*, 380 F.3d 1021, 1025 (7th Cir. 2004), Gross concedes that he hired certain police officers only because Loren-Maltese ordered him to do so. Hiring such individuals based only on orders to do so would not constitute performing a discretionary duty in good faith, *see RKI*, 177 F. Supp. 2d at 877; *Corroon & Black of Il., Inc. v. Magner*, 145 Ill. App. 3d 151, 160 (1986) (*Corroon & Black*), as required for immunity, *see Kinzer*, 128 Ill. 2d at 445.

12

*Merits of Breach of Fiduciary Duty Count*

To establish a claim of breach of fiduciary duty, a plaintiff must establish: (1) the existence of a fiduciary duty, (2) a breach of that fiduciary duty, and (3) that the breach proximately caused the injury of which the plaintiff complains. *See Cwikla v. Sheir*, 345 Ill. App. 3d 23, 32 (2003).

A public official owes a fiduciary duty if that duty is set forth in a statute. *See Madlener v. Finley*, 128 Ill. 2d 147, 151-52 (1989). Pursuant to 65 ILCS 5/10-2.1-1, Cicero established a BOFPC. Code of Ordinances of the Town of Cicero, Ch. 2, § 2-787(a). The sole authority to appoint a Cicero police officer is vested with the BOFPC. *See* 65 ILCS 5/10-2.1-4; *Rinchich v. Village of Bridgeview*, 235 Ill. App. 3d 614, 635 (1992). Pursuant to statute, all applicants must meet minimal requirements and are subject to an examination that is public and competitive. 65 ILCS 5/10-2.1-6(a).

Based on the above, Gross, as a member and Chairman of the BOFPC, owed a fiduciary duty to Cicero in the exercise of his decision to appoint Cicero Police Officers. However, Gross admits that he hired certain police officers based solely on Loren-Maltese's direction to hire those individuals. Therefore, when these officers were appointed on Loren-Maltese's orders, Gross breached his fiduciary duty by failing to appoint the police officers based on Gross's own judgment of the applicants' qualifications. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001) (*RKI*) (employee has duty to act solely in employer's interest); *Corroon & Black*, 145 Ill. App. 3d at 160 (fiduciary cannot act inconsistently with employer's trust).

Gross also argues that Cicero has failed to demonstrate that it suffered any damages proximately resulting from Gross's alleged breach. The injury to Cicero was the appointment of police officers whose competence in that regard had not been determined by the public officer who

13

was required by statute to do so. Gross appears to be arguing lack of proof of an injury and damages interchangeably. However, an injury and resulting damages are not synonymous. *See Jeffrey v. Chicago Transit Authority*, 37 Ill. App. 2d 327, 330 (1962) ("every invasion of a legal right calls for some recovery because the law presumes damage"); *McConnel v. Kibbe*, 33 Ill. 175, 179 (1864) ("The law infers damage from every infringement of a right."). Actual damages as a result of Cicero's injury are to be determined. Cicero contends that these damages include the cost of an investigation to determine if these police officers appointed by Gross are qualified. This includes any testing and re-evaluation and legal fees that may be incurred as a result of an unqualified police officer's official conduct and in the discharge or dismissal of any unqualified individual. Gross disputes Cicero's claimed damages, particularly those arising from the conduct of the officers whom Gross claims were otherwise qualified. At his deposition, although Gross repeatedly agreed that he hired "unqualified" individuals at the direction of Loren-Maltese, he insisted it would be necessary to review each individual's entire file to definitively state that certain individuals were "unqualified." Therefore, a genuine issue of material fact exists as to the extent of damages Cicero suffered. Accordingly, Gross's motion for summary judgment on Cicero's breach of fiduciary duty claim is denied. Cicero's motion for summary judgment is granted as to Gross's breach of fiduciary duty but denied on the issue of damages.

### Unjust Enrichment Claim

Gross moves for summary judgment on Cicero's unjust enrichment claim. Cicero argues that summary judgment should be denied because genuine issues of material fact exist as to Gross's term of employment and his compensation.

14

To establish a claim of unjust enrichment, a party must establish that the defendant retained a benefit to the party's detriment and that the retention of that benefit violates the fundamental principles of justice, equity, and good conscience. *See HPI Health Care Serv., Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989).

Cicero's counterclaim alleges that Gross unjustly received compensation after January 2002 because he did not do any work for Cicero after that time. However, the undisputed facts demonstrate that Gross was still employed by Cicero until September 23, 2002, when Gonzalez terminated his employment. Accordingly, Cicero has failed to demonstrate a genuine issue of material fact as to Gross's term of employment and that Gross received compensation thereafter.

Cicero also argues that the decrease in Gross's salary in 2002, from previous years, is evidence that he was not receiving one salary for all positions he held; therefore, a genuine issue of material fact exists as to whether he was unjustly compensated after some of those positions were terminated. However, Gross was not employed by Cicero for the entire 2002; this is consistent with the reduced amount of compensation he received in 2002. Moreover, Cicero has failed to submit any evidence contradicting Gross's testimony that he was paid one salary for any and all positions.

Cicero also argues that a genuine issue of material fact exists because Gross alleged in his Amended Complaint that he stopped receiving assignments as the Director of Internal Services in January 2002, which contradicts his deposition testimony that he continued to work in that position until September 23, 2002. However, this discrepancy does not establish a genuine issue of material fact as to Cicero's unjust enrichment claim because it is undisputed that, at a minimum, Gross was employed by Cicero until September 23, 2002, and that he was receiving one salary for all of his positions with Cicero, be it one position or five positions.

Based on the above, no genuine issue of material fact exists as to whether Gross received compensation when he was no longer working for Cicero. Accordingly, Gross's motion for summary judgment on Cicero's unjust enrichment claim is granted.

## Defendants' Motions for Summary Judgment

### *First Amendment Violations*

Defendants seek summary judgment on Gross's First Amendment violation claims arguing that Gross did not engage in protected speech. Gross argues that the Defendants retaliated against him for engaging in protected speech, including: (1) complaining about sexual harassment in the Cicero Police Department, (2) encouraging his daughter to file a charge of discrimination with the EEOC, and/or (3) providing information to attorneys for the plaintiff in the *Moreno* case.

A claim pursuant to 18 U.S.C. § 1983 for retaliation in violation of the First Amendment requires a three-step analysis. First, it must be determined whether the plaintiff's speech was constitutionally protected. If it was, then the plaintiff must prove the defendant's actions were motivated by the plaintiff's constitutionally protected speech. If the plaintiff demonstrates that his speech was a substantial or motivating factor in the defendant's actions, the defendant must demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his First Amendment rights. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999) (*Kokkinis*).

The determination of whether a plaintiff's speech was constitutionally protected is a question of law to be determined by the court. *See Kokkinis*, 185 F.3d at 843. Constitutionally protected speech includes speech that addresses a matter of public concern. *See Wernsing v. Thompson*, 423 F.3d 732, 751 (7th Cir. 2005) (*Wernsing*). Whether speech addresses a matter of public concern depends upon "the content, form, and context of [the speech], as revealed by the whole record."

*Connick v. Meyers*, 461 U.S. 138, 147-48 (1983). Of these factors, the content of the speech is the most important. *See Wernsing*, 423 F.3d at 751. Determining the motivation of the speaker is also important in making the determination of whether the speech is constitutionally protected because speech that it is intended to further a private interest or to air a personal employee grievance is not constitutionally protected, even if the speech addresses issues of public interest. *See Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004); *Kokkinis*, 185 F.3d at 844; *Friend v. Lalley*, 194 F. Supp. 2d 803, 810 (N.D. Ill. 2002) (*Friend*).

Gross's six *attempts* to speak to Loren-Maltese concerning the alleged sexual harassment of his daughter cannot be considered speech on a matter of public concern because the attempts never articulated a particular viewpoint, grievance or complaint. *See Wernsing*, 423 F.3d at 752 (e-mails seeking a meeting to discuss "concerns" about a potential appointment not protected speech because they failed to articulate a particular viewpoint, grievance or complaint).

Even if the attempts to speak with Loren-Maltese did articulate a complaint about the alleged sexual harassment of Gross's daughter, they constituted no more than a private employee grievance. The issue of sexual harassment in public employment is a matter of public concern. *See Kokkinis*, 185 F.3d at 844. When viewed in light of the whole record, Gross's attempts to speak to Loren-Maltese about the sexual harassment of his daughter is found to be no more than an attempt to address a private grievance. Gross's motivation was clearly to improve the employment environment of his daughter rather than the situation of the community in general. *See Friend*, 194 F. Supp. 2d at 811.

Gross's encouragement of his daughter to file a charge with the EEOC similarly was made to improve her employment circumstances rather than to address sexual harassment as a matter of

17

public concern. Gross presents no evidence that the purpose of encouraging his daughter to file an EEOC charge was more than furthering a private interest. *See Friend*, 194 F. Supp. 2d at 811.

Gross also alleges that he engaged in protected speech by providing information to Moreno's attorney about Loren-Maltese's retaliatory practices and unlawful conduct. Assuming that Gross spoke with Moreno's attorney about such matters and that such matters constitute protected speech, Gross has failed to demonstrate that such speech was a substantial or motivating factor in the alleged retaliation of withholding his backpay because the protected speech occurred *after* Gross was informed that his backpay issue would not be resolved until the *Moreno* case was resolved.[3]

Based on the above, summary judgment is granted in Defendants' favor on Gross's First Amendment retaliation claims.

Gross also alleges a civil conspiracy in violation of 18 U.S.C. § 1985(3) and § 1983 by Loren-Maltese, Gonzalez, and Vrdolyak to retaliate against Gross based on his exercise of his First Amendment rights.

Section 1985(3) provides a remedy where "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law . . . ." To establish a cause of action pursuant to Section 1985(3), a plaintiff must demonstrate: (1) a conspiracy (2) for the purpose of depriving any person or class of persons of the equal protection of the law and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his property or person or deprived of any privilege of a citizen

---

[3]By simply being named as a potential witness in the *Moreno* case would not constitute protected speech. *See Wernsing*, 423 F.3d at 752 (speech that has not occurred, "for First Amendment retaliation purposes, is no speech at all.")

of the United States. *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 828-29 (1983). The "equal protection" language in Section 1985 requires that claims brought under this section be supported by allegations that the conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffith v. Breckenridge*, 403 U.S. 88, 102 (1971) (*Griffith*). Furthermore, Section 1985(3) does not extend to a conspiracy to retaliate against a person based upon that person's exercise of their First Amendment rights. *See Herhold v. City of Chicago*, 723 F. Supp. 20, 36 (N.D. Ill. 1989); *Norflo Holding Corp. v. City of Chicago*, 2002 WL 453605 (N.D. Ill. March 22, 2002). Accordingly, Gross's claim of a conspiracy to retaliate against him cannot be based upon his exercise of his First Amendment rights.

To demonstrate a conspiracy in violation of Section 1983, a plaintiff must demonstrate an express or implied agreement among the defendants to deprive the plaintiff of his constitutional rights and an actual deprivation of those rights in the form of overt acts in furtherance of the agreement. *See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (*Scherer*). Gross alleges that Loren-Maltese, Gonzalez, and Vrdolyak conspired to retaliate against him for exercising his First Amendment rights and acted in furtherance of the agreement by removing him from his positions with Cicero and by threatening him regarding his testimony in the *Moreno* case.

Gross's evidence of an implied agreement between Loren-Maltese, Gonzalez, and Vrdolyak consists of the "friendship" between the Defendants, Vrdolyak's purported relationship with Rodish, that Vrdolyak's firm was involved in his daughter's discrimination case, and Vrdolyak's statement, "I can't understand why she did this to you," after learning that Gonzalez terminated Gross from his position as Deputy Liquor Commissioner. Assuming this evidence is adequate circumstantial evidence of an agreement between the Defendants, Gross has not shown that the Defendants'

19

conduct actually deprived him of his constitutional right under the First Amendment. *Scherer*, 840 F.2d at 442. Gross's attempts to address the alleged sexual harassment of his daughter was not protected First Amendment speech; his testimony in the *Moreno* case was not precluded by any actions of Vrdolyak or Loren-Maltese; and he was never called as a witness in the *Moreno* case. Accordingly, his conspiracy claim pursuant to Section 1983 also fails.

Based on the above, summary judgment is granted in Defendants' favor on Count I of Gross's First Amended Complaint.

### Equal Protection Violations

The Equal Protection Clause grants to all citizens "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Baumgardner v. County of Cook*, 108 F. Supp. 2d 1041, 1054-56 (N. D. Ill. 2000) ("A single act against one individual can be a violation of the Equal Protection Clause . . . it is sufficient to prove discrimination against the plaintiff because of his membership in a particular class."). Under a "class of one" theory, the plaintiff must demonstrate that: "(1) . . . he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (*McDonald*).

Gross concedes that he has not identified any similarly situated individual but argues that such requirement "is not in keeping with the spirit" of the equal protection clause. However, in a class of one equal protection claim, the plaintiff must identify a similarly situated individual that was

intentionally treated differently than the plaintiff. Failure to do so is fatal to a class of one equal protection claim. *See McDonald*, 371 F.3d at 1001-02; *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078-79 (7th Cir. 2005); *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005).

Gross also alleges that the Defendants conspired to deprive him of his equal protection rights in violation of 42 U.S. Sections 1985(3) and 1983.

Gross has not provided proof of racial or class-based invidious discrimination, *Griffith*, 403 U.S. at 102; and a "class of one" theory does not support a claim under Section 1985(3), *see Burns v. State Police Ass'n of Mass.*, 230 F.3d 8, 12 n. 4 (1st Cir. 2000); *Cataldo v. Moses*, 2005 WL 705359 (D.N.J. March 29, 2005); *Aida Food & Liquor, Inc. v. City of Chicago*, 2004 WL 719663 (N.D. Ill. March 31, 2004). Furthermore, Gross has not shown that the Defendants' conduct actually deprived him of his constitutional right to equal protection. Accordingly, his conspiracy claim pursuant to Section 1983 also fails.

Based on the above, summary judgment is granted in Defendants' favor on Count II of Gross's First Amended Complaint.

### Qualified Immunity

Alternatively, Loren-Maltese argues that she is protected from liability under the doctrine of qualified immunity.

If a public official raises the defense of qualified immunity, the plaintiff bears the burden of showing: (1) whether she has asserted a violation of a constitutional right and (2) whether the applicable constitutional standards were clearly established at the time the alleged violation occurred. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). A clearly established right is established if the plaintiff can demonstrate that "the contours of the right [are] sufficiently clear that

a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (*Anderson*). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful . . . but is to say that in light of the pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 639-40.

Both the First Amendment right of protecting speech and the Fourteenth Amendment right to equal protection were clearly established at the time of the alleged constitutional violations. *See Kokkinis*, 185 F.3d at 843-44; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Accordingly, Loren-Maltese is not protected to liability by the qualified immunity doctrine.

## Intra-Corporate Conspiracy Doctrine

Alternatively, Defendants argue that Gross's conspiracy claims are barred by the intra-corporate conspiracy doctrine.

"The intra-corporate conspiracy doctrine precludes members of the same entity from becoming 'conspirators' when they act within the scope of their authority." *Fairley v. Andrews*, 300 F. Supp. 2d 660, 668 (N.D. Ill. 2004) (*Fairley*). Here, Gross has alleged that Defendants conspired to deprive him of his First and Fourteenth Amendment rights. Agreeing to harass and/or retaliate against an employee is not within the scope of Defendants' authority; accordingly, Gross's conspiracy claims would not be barred by the intra-corporate conspiracy doctrine. *Fairley*, 300 F. Supp. 2d at 669.

**CONCLUSION**

For the reasons stated above: (1) Gross's Motion for Summary Judgment on Cicero's Counterclaim is granted as to Cicero's unjust enrichment claim and denied as to Cicero's breach of fiduciary duty claim; (2) Cicero's Motion for Partial Summary Judgment is granted as to Gross's breach of fiduciary duty but denied on the issue of damages; (3) Cicero and Gonzalez's Joint Motion for Summary Judgment is granted; (4) Loren-Maltese's Motion for Summary Judgment is granted; and (5) Vrdolyak's Motion for Summary Judgment is granted.

Dated: February 1, 2005

JOHN W. DARRAH
United States District Court Judge